# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMAZENTIS SA and TIMELINE LONGEVITY, INC.<br><br>                           Plaintiffs,<br><br>       vs.<br><br>THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS, IDENTIFIED ON SCHEDULE "A"<br><br>                           Defendants. | Civil Action No. _____<br><br>**COMPLAINT**<br><br>Jury Trial Demand |

Amazentis SA ("Amazentis") and Timeline Longevity, Inc. ("Timeline Longevity") (collectively "Plaintiffs"), file this complaint against the Partnerships and Unincorporated Associations identified on Schedule A attached hereto[1] (collectively, "Defendants") for violation of the Lanham Act, Section 93(a) of the Massachusetts General Laws, false advertising, unfair competition, trademark infringement, false designation of origin, engaging in deceptive trade practices, and common law trademark infringement and unfair competition, and allege as follows:

---

[1] The Schedules and Exhibits attached here to are incorporated into this Complaint as if fully set forth herein, however are subject to Plaintiffs' request to seal.

## NATURE OF THE ACTION AND INTRODUCTION

1.     Plaintiffs' claims arise under Sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1125 *et seq*. for unfair competition, false advertising trademark infringement, and false designation of origin, the Massachusetts Unfair Competition Law, Mass. General Laws §§ 93(a) *et seq* for deceptive trade practices, and the common law for trademark infringement and unfair competition.

2.     Plaintiffs bring this action to compel Defendants to cease their false, deceptive, and misleading sale of urolithin A supplement products, which they have done through at least the e-commerce stores operating under the brands identified in Schedule A.  In doing so, Defendants have falsely claimed that their products contain the active ingredient urolithin A in the amount recited on the product label – when, in fact, they do not contain the listed amount of urolithin A or, in many cases, any detectable amount of urolithin A.  Plaintiffs also bring this action to compel Defendants to compensate Plaintiffs for the harm caused by their unlawful actions.

## Urolithin A, Amazentis & Timeline

3.     Founded in 2007 by researchers at the Swiss Federal Institute of Technology, Amazentis is a pioneer in urolithin A research and development.

4.     Urolithin A is a compound produced in the intestinal microflora of some but not all humans and mammals.  Over the course of the last seventeen

years, scientists working at or on behalf of Amazentis have conducted extensive pre-clinical testing and human clinical trials demonstrating that urolithin A has numerous benefits that support healthy aging. Over the same period, scientists at Amazentis developed methods to manufacture large quantities of urolithin compounds outside of the mammalian gastrointestinal tract.

5. After more than a decade of research and development, in 2020 Plaintiffs launched the first nutritional supplement product under the TIMELINE® brand, containing urolithin A as an active ingredient, branded as MITOPURE®.

6. Since its launch in 2020, nutritional supplements containing MITOPURE® brand urolithin A, as sold by Plaintiff Timeline Longevity (Amazentis' wholly owned subsidiary), have become some of the best-selling and most sought after products in the category of supplements for healthy aging.

7. To protect its extensive investments in researching, developing and commercializing Urolithin nutritional supplements and other products, such as for skincare, Amazentis has invested in securing dozens of patents throughout the world related to urolithin-containing compounds, including patents directed to the synthesis of urolithin compounds, compositions containing urolithin compounds, and using effective amounts of urolithin compounds for beneficial effects on the body and health outcomes.

8.      Amazentis has also formally registered its trademarks, including MitoPure, MITOPURE, and the MITOPURE logo **mitopure** (collectively, the "MITOPURE® trademark"), in connection with a wide range of products, including *inter alia* "for use as dietary supplement for humans" and "a featured component ingredient of dietary supplements for humans."  Those marks have been registered as follows: MitoPure as Reg. No. 6,513,775, MITOPURE as Reg. No. 7,638,795, and MITOPURE logo **mitopure** as Reg. 6,303,966.  True and correct copies of the United States federal registration certificates for these are attached as **Exhibit 1 (1-1, 1-2, and 1-3 respectively).**  These registrations are in full force and effect.

**Proliferation of False Urolithin A Products**

9.      Starting in 2023, copycat supplements purporting to contain urolithin A began to appear on Amazon's e-commerce platform sourced from one or more manufacturers.  Subsequent testing performed by a contract laboratory hired by Plaintiffs has confirmed that many of these new supplements purporting to contain "urolithin A" do not contain the amount of urolithin A recited on the label or, in fact, do not contain any detectable amount of urolithin A at all.

10.      On information and belief, these fake and falsely labeled urolithin A supplements appeared to have been manufactured by the same companies in the People's Republic of China; this appears to be true based on the size, color and

shape of the packaging and capsules (as illustrated in Schedule B, Figure 1) as well as based on other information contained on the Amazon storefronts for each product. These fake urolithin A supplement products are sold at much lower prices than Amazentis' own urolithin A supplement products.

11.     Since these fake and falsely labeled urolithin A supplements began to appear on Amazon.com, Plaintiffs have worked with Amazon to identify and remove the fake urolithin A supplement product pages. While some improper listings were removed, these and other fake urolithin A supplement sellers have since engaged in conduct to thwart those efforts. This conduct includes selling fake urolithin A supplements under new and different brands, generating new product pages on Amazon, selling the same supplement under different seller names, or, more recently, selling the same brands of fake urolithin A on other e-commerce platforms including, for example eBay, IBSPOT, and Alibaba.com.

12.     Certain of these falsely labeled urolithin A brands are using Plaintiffs' MITOPURE® trademark, despite neither having any connection with nor any permission by Plaintiffs. This is likely to, and on information and belief is intended to, mislead consumers into believing that Defendants' fake urolithin A supplement products are provided, sponsored, endorsed, approved by, provided through, or otherwise affiliated with Plaintiffs and their MITOPURE® brand. These Defendants were not authorized to use or display any of Plaintiffs'

MITOPURE® trademark nor have their products included any of Plaintiffs'
urolithin A ingredient.

13.     Faced with a proliferation of Defendants' supplement brands falsely
purporting to contain amounts of urolithin A sold across multiple e-commerce
platforms—many using Plaintiffs' MITOPURE® trademark or being falsely
marked in additional ways (*e.g.,* as *Made in the USA* or *vegan*)—and the increasing
and irreparable harm Plaintiffs now face as a consequence, Plaintiffs now bring
this action to enjoin Defendants' deceptive conduct and to seek monetary relief.

## PARTIES

### Plaintiffs Amazentis SA and Timeline Longevity, Inc.

14.     Amazentis SA is a corporation organized under the laws of
Switzerland with its principal place of business at EPFL Innovation Park Batiment
C, Ecublens, 1024, Switzerland, and appears in this venue for the limited purpose
of bringing this litigation.

15.     Timeline Longevity, Inc. is a corporation organized under the laws of
the State of Delaware with its principal place of business at 824 U.S. Highway 1,
Suite 320, North Palm Beach, Florida 33408, and it is a wholly owned and
operated subsidiary of Amazentis SA.

**Defendants**

16.     Defendants are individuals and business entities of unknown makeup who own and/or operate one or more of the e-commerce stores and their own websites, and they sell what purports to be urolithin A supplement products throughout the United States, including in Massachusetts, under at least the brands and seller aliases identified on Schedule A and/or other brands and seller aliases not yet known to Plaintiffs.

17.     A true correct copy of a compilation of the Amazon e-commerce webpages for the urolithin A products identified in Schedule A is attached as **Exhibit 2 (2-1 to 2-30)** to this Complaint.

18.     On information and belief, most if not all Defendants reside and/or operate in the People's Republic of China or other foreign jurisdictions with lax and inconsistently enforced regulations for enforcing intellectual property rights and protecting consumer welfare, particularly for products that are exported out of those jurisdictions into the United States.

19.     Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

20.     On information and belief, Defendants either individually or jointly operate one or more e-commerce stores under the brands listed in Schedule A.  On information and belief, all of Defendants' e-commerce interactions—including

product inquiries, order placements, and customer service—are conducted electronically.

21.    On information and belief, Defendants' e-commerce listings and seller profiles routinely provide electronic contact information, such as e-mail addresses, online messaging portals, and e-commerce platform-based communication tools, as the principal means for customers and third parties to reach them.  *Id*.  These electronic channels are not only used for sales and marketing but also serve as the primary interface for all business-related correspondence.

22.    Defendants accept payments through electronic means, including credit cards, Amazon Pay, and PayPal, and facilitate order fulfillment and customer support exclusively through online interfaces.

23.    Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiffs to discover Defendants' true identities and the exact interworking of their commercial network.  If Defendants provide additional credible information regarding their identities, or if additional information becomes known to Plaintiffs indicating the Defendants' true identities, Plaintiffs will take appropriate steps to amend the Complaint.

24.    On information and belief, one or more of the identified Defendants are actually operating under fake names and aliases.  The tactics used by

Defendants are intended to, and do, hide their true identities and the full scope of their operations. These tactics also hide the true scope of their seemingly interlocking networks.

## JURISDICTION AND VENUE

25.     This is an action arising under (i) Sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1125 *et seq*. for unfair competition, false advertising, trademark infringement, and false designation of origin; (2) the Massachusetts Unfair Competition Law, Mass. General Laws §§ 93(a) *et seq* for deceptive trade practices; and (3) the common law for trademark infringement and unfair competition.

26.     This Court has subject matter jurisdiction over Defendants pursuant to 28 U.S.C. §§1331. This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a) because they are related to Plaintiffs' Lanham Act claim and form part of the same cases or controversies underlying that claim.

27.     Venue is proper in this District under 28 U.S.C. §§1391 *et seq.*

28.     This Court also may properly exercise personal jurisdiction over Defendants, including under the Massachusetts' Unfair Competition Law, Mass. General Laws §§ 93(a) *et seq*, since each of the Defendants directly targets business activities toward consumers in the United States, including

Massachusetts, through at least e-commerce stores operating under the brands identified in Schedule A.

29.    Specifically, Defendants have targeted sales to Massachusetts residents by setting up and operating the e-commerce stores identified on Schedule A that target United States consumers using one or more of the brands identified in Schedule A, offering shipping to the United States, including Massachusetts, and accepting payment in U.S. dollars and/or funds from U.S. bank accounts.  On information and belief, Defendants have sold dietary supplement products falsely claiming to have urolithin A as an active ingredient to residents of Massachusetts.

30.    Each of the Defendants is committing tortious acts in Massachusetts, engaging in interstate commerce directed *inter alia* to purchasers in this District, and wrongfully causing Plaintiffs substantial injury in the State of Massachusetts.

31.    Joinder of the Defendants is proper pursuant to Federal Rule of Civil Procedure 20(a) as the Defendants all are falsely labeling their products in similar ways.  All Defendants are offering for sale urolithin A products that do not contain the amount of urolithin A claimed on their product labels, and/or any urolithin A in a detectable quantity.  This case will involve common questions of fact as to all Defendants and the Defendants' wrongful acts arise out of the same transaction, occurrence, or series of transactions or occurrences related to the making, using, importing into the United States, offering for sale, or selling of the same or similar

fake and falsely labeled urolithin A products as described here through unregistered or fictitious business entities for which fake addresses are given, and by conducting business through a web of private mail drop stores.

32.    Moreover, as set out below, it appears that at least several of the Defendants identified on Schedule A are selling products purporting to contain urolithin A from a common source/supplier and/or are acting in concert.

## DEFENDANTS' UNLAWFUL CONDUCT

33.    Shortly after Plaintiffs started selling urolithin A supplement products on Amazon.com at the end of  2022 under the TIMELINE® and MITOPURE® trademarks, copycat supplement products purporting to also contain urolithin A began appearing and claiming to offer the same ground-breaking benefits that Plaintiffs had established for their own urolithin A supplement with rigorous clinical trials, but at significantly lower prices than Plaintiffs' urolithin A supplements.  These copycat urolithin A supplement products first appeared on Amazon's e-commerce platform, but more recently have proliferated across the internet to other e-commerce platforms.

34.    After the copycats started selling products purportedly containing urolithin A, in the form of soft gel capsules, Plaintiffs identified six identical products sold under different brand names. Each of these brands is identified on Schedule A, as Brands Nos. 1 to 6.

35.    In addition to the identical capsules for Schedule A, Brands Nos. 1 to 6, other evidence suggested that each of the separate brands had the same ultimate source.  This includes, for example, that all packages, bottles, and urolithin A supplement capsules were identical in shape and size, as illustrated in the pictures in Figure 1 of Schedule B.  Moreover, each of these six products have the same manufacturer number prefix in the UPC-A barcodes contained on their packaging (circled in Schedule B. Figure 2), further indicating that they were sourced from the same manufacturer.

36.    Moreover, the Amazon.com pages for each brand included unregistered or incomprehensible business names (*see* Schedule A) or questionable United States addresses.

    a.    For example, certain of the fake urolithin A brands on Schedule A have listed addresses on Amazon that appear to have been taken from multiple listing service listings for recently sold properties. *See, e.g.,* Schedule B, Figure 3.

    b.    As another example, certain of the fake urolithin A brands on Schedule A provide addresses on Amazon or the product package that are the same as private mailbox centers in the same cities, addresses that do not exist, or identify "business name[s]" that are not registered as business the States where the addresses are

purportedly located, as illustrated in **Exhibit 3**, which is a true and correct copy of an investigation report prepared by Timothy Santoni, a licensed private investigator retained by Plaintiffs. *See* **Exhibit 3** (Santoni Investigation Report). *See also, e.g.,* Schedule B, Figures 4, 5.

37.     Further illustrating the dubious nature of the sellers, many of the packages for the fake urolithin A brands on Schedule A have included a different U.S. address than what is listed on Amazon, which address also appears fake upon further investigation.  These fake addresses include addresses in open fields, barn yards, and wooden areas, and in some instances they are addresses that do not exist.  *See* Schedule B, Figures 6, 7.

38.     In early 2024 Plaintiffs contacted Amazon's legal department, which facilitated the removal of the Amazon.com pages for the fake urolithin A products sold under the first six brands identified on Schedule A.  However, over the course of the past year, the Defendants responsible for the previously removed brands opened new pages on Amazon.com, started selling their apparently fake urolithin A supplements on other e-commerce platforms, and/or started selling urolithin A under new brands on Amazon.com and other e-commerce platforms (*see e.g.* Schedule B, Figure 4, 8; *see generally* **Exhibit 3** (Santoni Investigation Report)).

39.     Moreover, during the last year the number of brands of fake urolithin A supplements has proliferated on Amazon and on other e-commerce platforms. At present, there are ***dozens*** of brands selling "urolithin A" supplements that have been confirmed by product testing to have no detectable urolithin A or urolithin A in an amount far below the amount claimed on the product label, strewn across various e-commerce platforms directed to customers in Massachusetts and, more broadly, in the United States.

40.     During this time, some sellers of these "urolithin A" products have started to use Plaintiffs' MITOPURE® trademark to sell their fake supplements. This use falsely designates Defendants' products as emanating from, including ingredients from, or otherwise having an association with Plaintiffs and their brand, when in fact no such association exists.

41.     Alarmed by the recent reappearance and proliferation of these fake and falsely labeled urolithin A supplement products, Plaintiffs retained Exponent, Inc., an independent American scientific consulting and testing company, to investigate these urolithin A supplement products.

42.     Exponent thereafter obtained and tested the supplement products listed as item numbers one to twenty-six on Schedule A to this complaint. A true and correct copy of Exponent's report detailing both the results of its testing and its

testing methodology is attached as **Exhibit 4** to this Complaint (the "Exponent Report").

43.     The Exponent Report sets forth testing results for twenty-six products: ten gel capsules, twelve powder-filled capsules, one powder product, and three liquid-drop products.  The Exponent Report details that twenty-three of the tested products do not contain any measurable urolithin A, and three had detectable urolithin A significantly below the amount claimed on the product label (*i.e.,* only 0.29%, 4.6% and 1.3% of the amount claimed on the label).

44.     In addition, Exponent's testing found other similarities between many of the Defendants' fake and falsely labeled urolithin A supplement products sold under the brands identified on Schedule A, indicating they are likely being sourced from and sold by one or more common entities.

45.     The Exponent Report includes the results of Fourier Transform Infrared Spectroscopy ("FTIR"), a technique for analyzing materials by measuring their absorption of infrared light.  In many instances, this process detects the unique "fingerprint" of a sample's chemical bonds and functional groups, allowing for the identification of its substances and their quantification.

46.     The Exponent Report stated that "[t]he FTIR spectra of the ten gels were all generally consistent with fatty acid/ester-based oil material, such as fish oil or seed oil (Appendix C, Figure C4).  Further, five of the ten gel products and

their capsule materials also exhibited a high degree of similarity to one another (Figure 1), suggesting that the same materials may have been used." *See* **Exhibit 4** at 4-6.

47.    For the twelve powder products, the Exponent Report set out that "[t]he FTIR spectrum of the powder present in the capsules was generally consistent with that of corn starch." *See* **Exhibit 4** at 5.

48.    The Exponent Report further observed that the spectra for three of the twelve powder products "were generally consistent with that of a mixture of corn starch and calcium carbonate." *See* **Exhibit 4** at C-3.

49.    The fact that Defendants' products contain the same filler ingredients – not identified on the product labels – in place of the advertised urolithin A (such things as fish/seed oil and corn starch) provides further evidence indicating that these products are likely sold by and/or sourced from one or more common entities.  Notably, for the first five products identified on Schedule A, the Exponent Report specifically stated that IR spectra testing is "indicative of a high degree of compositional similarity, such as would be expected from the same grade or source of material." *See* **Exhibit 4** at 4-6.

50.    Separately, the Exponent Report test data is supported by SuppCo, a company that describes its mission as "help[ing] you be healthier through supplements."  SuppCo recently publicly released its own independent testing for

ten urolithin A products available on Amazon and found that six were "completely missing the active ingredient." The six products "missing the [urolithin A] active ingredient" include two that Exponent tested (Appendix A, items 3 and 9) as well as four additional urolithin A products that are available on Amazon (Appendix A, items 27-30). A true and correct copy of SuppCo's urolithin A testing report, dated September 9, 2025, as downloaded from the internet, is attached hereto as **Exhibit 5**.

51.    On information and belief, the urolithin A products tested by Exponent and the urolithin A products tested by SuppCo are sourced from one or more common manufacturers. Schedule B, Figure 9.

52.    Defendants' false advertising is not limited to selling urolithin A capsules that do not contain measurable urolithin A or that contain urolithin A well below the amount claimed on the product labels. They also extend to other acts of deception and false labeling. As noted above, Defendants have included false addresses in the United States on their packaging to give consumers the false impression that they are purchasing supplement products from a U.S. company.

53.    Indeed, some Defendants falsely represent that their fake urolithin A supplements are "MADE IN USA" even though they are (based upon information and belief) made in the People's Republic of China. For example, numerous products identified on Schedule A purport to be "MADE IN USA" but the detailed

seller information on Amazon.com indicates those products are sourced from the People's Republic of China. *See e.g.,* Schedule A, Item Nos. 7 & 11.

54.    Moreover, at least one of the Defendants identified on Schedule A (No. 1) previously listed its business address on Amazon as in the People's Republic of China but has since "updated" its address to a United States address. On information and belief, this conduct is yet another attempt by Defendants to mask true identities and locations and to deceive customers.

55.    Certain Defendants also describe their supplements as "vegan" or "veggie" when, on information and belief, the capsules contain non-vegan gelatin.

56.    On information and belief, Defendants have further falsely made numerous claims that their products are subject to third-party testing and other quality assurance measures (e.g., advertising their urolithin A capsules as being "clinically tested," "GMP certified," "pure and effective" "third-party lab tested," subject to "globally recognized quality standards" or "undergo[] rigorous quality testing and control") in an attempt to deceive customers and give those customers false reassurances when purchasing Defendants' fake urolithin A products.

57.    Even though Defendants operate under multiple fictitious aliases and brands, the e-commerce pages selling the brands of products listed in Schedule A share many similarities indicating that the Defendants are connected or that specific Defendants control multiple brands. These similarities include the use of

templates with common design elements, similar marketing messages, keywords and advertising tactics, similarities in price and quantities, similarly incorrect grammar and misspellings, and/or the use of the same or similar text and images, all of which suggest a common source.

58.     Illustrating that Defendants are likely acting together and may be the same entity or group of entities, Defendants also concurrently employ and benefit from substantially similar advertising and marketing strategies.  Defendants make similar product claims regarding their urolithin A supplement products and their marketing images and literature have similar and, in many cases, nearly identical forms.

59.     On information and belief, Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell urolithin A products that are falsely and fraudulently labeled.

60.     Defendants also have deceived customers by using Plaintiffs' MITOPURE® trademark without authorization to advertise and sell their fake urolithin A supplement products, including but not limited to use of the MITOPURE® trademark on products, advertising and promotional materials, and/or product listing titles and text.  *See, e.g.,* Schedule B, Figure 9.

61.     Defendants' unauthorized use of Plaintiffs' MITOPURE® trademark is a deliberate attempt to divert customers and sales away from Plaintiffs to

Defendants' fake urolithin A products.  Such use incorrectly communicates that

Plaintiffs sponsor, endorse, or approve, or are otherwise affiliated with,

Defendants' fake urolithin A products, or otherwise deceptively conveys that such

products contain genuine MITOPURE® brand urolithin A.

62.     By using Plaintiffs' MITOPURE® trademark without authorization

within the context, text, and/or meta tags of their e-commerce storefronts,

Defendants divert customers and sales away from Plaintiffs since various search

engines looking for websites to return in response to consumer searches for

Plaintiffs' own MITOPURE® urolithin A products also identify and include in

their search results Defendants' fake urolithin A products.  Schedule B, Figure 9.

63.     Moreover, Defendants facilitate sales by designing e-commerce

storefronts operating under seller aliases that appear to be legitimate businesses

(which are not registered or do not exist) with real addresses (that are fake or

deceptive) so that they appear to consumers to be authorized and reputable online

retailers.  These e-commerce storefronts operating under the Defendants' seller

aliases appear sophisticated and accept payment in U.S. dollars and/or funds from

U.S. bank accounts via credit cards, Amazon Pay, and/or PayPal.

64.     Defendants have specifically targeted sales to Massachusetts residents

by setting up and operating e-commerce storefronts that target United States

consumers using one or more of the brands listed on Schedule A, offering shipping

to the United States, including Massachusetts, accepting payment in U.S. dollars and/or funds from U.S. bank accounts, and, on information and belief, actually selling to residents in Massachusetts nutritional supplement products that purportedly contain the amount of urolithin A specified on the products label, but that either do not contain the labeled amount of urolithin A or any urolithin A.

65. E-commerce store operators selling fraudulent and falsely labeled products, such as Defendants, commonly engage in fraudulent conduct when registering their e-commerce storefronts with e-commerce platforms, like Amazon, by providing false, misleading, and/or incomplete information to those platforms to prevent discovery of their true identities and the scope of their operations.

66. E-commerce store operators selling fraudulent products, such as Defendants, regularly create new brands and aliases for the purpose of offering for sale and selling fraudulent products. Such seller alias and brand registration patterns are a tactic used by fraudulent e-commerce store operators, such as Defendants, to conceal their identities and the full scope and interworking of their operation and to avoid being shut down.

67. Defendants have jointly and severally, knowingly, and willfully offered for sale, sold, and/or imported into the United States for subsequent resale or use purported urolithin A products that are falsely and fraudulently labeled.

68.     Each e-commerce store operating under Defendants' aliases and brands offers shipping to the United States, including Massachusetts, and, on information and belief, each Defendant has sold urolithin A products that are falsely and fraudulently labeled into the United States and Massachusetts over the Internet, and shipped product to the United States and Massachusetts to complete those sales.

**DEFENDANTS' FALSE ADVERTISING,
UNFAIR COMPETITION, AND
DECEPTIVE TRADE PRACTICES HAVE HARMED AND
CONTINUE TO HARM CUSTOMERS AND PLAINTIFFS**

69.     Consumers rely on product labels and online product listings, including Defendants' fake urolithin A supplement labels and e-commerce advertising, when making purchasing decisions.  Both types of materials constitute commercial advertising.

70.     By advertising and selling "urolithin A" supplements that purportedly contain the amount of urolithin A specified on the products label, but that do not contain the labeled amount of urolithin A or even any measurable urolithin A, Defendants have engaged in false and misleading advertising that has harmed the customers of these products who rely on the accuracy of labels for supplement products.

71.     Defendants' sales of products that are also falsely labeled as being subject to third-party testing and other quality assurance measures (e.g., "clinically

tested," "GMP certified," "pure and effective" "third-party lab tested," subject to "globally recognized quality standards" and that they "undergo[] rigorous quality testing and control") when in fact they are not, falsely labeled as being "MADE IN USA" when in fact they are made in the People's Republic of China, and falsely labeled as being "vegan" or "veggie" when in fact (on information and belief) they have animal products such as gelatin. Defendants products further recite addresses and business names that do not exist. These additional instances of false advertising further exacerbate the harm to consumers and Plaintiffs. Purchasers are denied the benefits they were deceived into believing the products would offer and deceived into purchasing a product from a seller they incorrectly believe is legitimate. Plaintiffs are harmed by being forced to compete against lower priced products with additional benefits from brands that appear legitimate, the net effect of which is to make the fake and falsely advertised urolithin A products sold by Defendants appear even more competitively priced.

72. Since consumers are accustomed to relying on advertising and product labeling, they are likely to be deceived by Defendants' false statements described above.

73. Consumers specifically seek out urolithin A supplements for the benefits urolithin A is known to have, so it is not only material, but essential, to their purchasing decisions that such supplements actually contain that ingredient.

And whether a product is made in the USA, is subject to third-party testing and other quality assurance measures, is vegan or vegetarian, is material to significant subsets of consumers.

74.     Defendants' sales of falsely labeled "urolithin A" supplements also raise significant consumer health concerns.  Examples of such concerns include the following questions:

➤ If Defendants' "urolithin A" supplements do not actually contain "urolithin A," what is contained in these supplements?

➤ Are there other undeclared fillers (besides seed/fish oil and cornstarch) or other undeclared substances in Defendants' "urolithin A" capsules and could these undeclared substances present a health risk to customers of these products?

75.     The United States Food and Drug Administration has posted on its website at www.fda.gov/drugs/buying-using-medicine-safely/counterfeit-medicine (visited October 1, 2025), that

Counterfeit (fake or falsified) medicines may be harmful to your health because while being passed off as authentic, may contain the wrong ingredients, contain too much, too little or no active ingredient at all or contain other harmful ingredients.

76.     The United States Drug Enforcement Agency has posted a fact sheet at www.dea.gov/sites/default/files/2021-

05/Counterfeit%20Pills%20fact%20SHEET-5-13-21-FINAL.pdf (visited October

1, 2025), that states:

> Counterfeit pills are fake medications that have different ingredients than the actual medication. They may contain no active ingredient, the wrong active ingredient, or have the right ingredient but in an incorrect quantity. Counterfeit pills may contain lethal amounts of fentanyl or methamphetamine and are extremely dangerous because they often appear identical to legitimate prescription pills, and the user is likely unaware of how lethal they can be.

77.    Similarly, the US National Institutes of Health has posted on its

website at pmc.ncbi.nlm.nih.gov/articles/PMC9031510/ (visited October 1, 2025)

(footnotes omitted):

> Counterfeits, however, may contain no active ingredients, incorrect amounts, or incorrect ingredients (e.g., chalk, mercury, paint, deadly poisons). They may also include significant impurities and contaminants … They are available via illegal street markets, websites, legitimate pharmacies, clinics, and hospitals.

78.    Numerous recent studies have observed that undeclared substances in

adulterated dietary supplements posed a potential and meaningful health risk since

those undeclared substances may cause allergic reactions, may interfere with

medications a customer is taking, or may themselves be toxic. *See e.g.,* Tucker et

al., *Unapproved Pharmaceutical Ingredients Included in Dietary Supplements*

*Associated with U.S. Food and Drug Administration Warnings,"* [published online

Oct. 12, 2018] *JAMA Netw. Open. 2018;1(6):e183337*

(doi:10.1001/jamanetworkopen.2018.3337); Ross JA, et al. *Outbreak of severe*

*hypoglycemia after ingestion of a male enhancement supplement* — Virginia,

August–November 2019 [published online June 19, 2020]. *MMWR Morb Mortal*

*Wkly Rep* 2020;69:740–743. doi: 10.15585/mmwr.mm6924a3external icon.

79.    Defendants' misrepresentations regarding their "urolithin A"

supplements have also harmed and continue to harm Plaintiffs.  Defendants' fake

urolithin A supplement products directly compete against Plaintiffs' MITOPURE®

urolithin A supplement products, including as illustrated by blog posts such as the

ones attached hereto as **Exhibit 6 (6-1 and 6-2)**.  As a result, Defendants' sale of

fake and falsely labeled urolithin A supplement products has caused Plaintiffs to

lose sales of their urolithin A products.

80.    Similarly, on the Amazon.com product page for Plaintiffs'

TIMELINE® MITOPURE® urolithin A supplement products, the part of the page

identifying "Products related to this item" identifies purported urolithin A products

listed on Schedule A, that do not contain urolithin A in the amount recited on the

label or at all, as alternatives to Plaintiffs' own products at a lower price point.  A

true and correct copies of Plaintiffs' TIMELINE® MITOPURE® urolithin A

Amazon.com product pages for Plaintiffs' softgel, powder and gummy products

are attached hereto at **Exhibit 7** (7-1 to 7-3).

81.    Defendants' misrepresentations regarding their fake "urolithin A"

supplements have also harmed and continue to harm Plaintiffs' reputation and

Plaintiffs' ongoing efforts and investments to build the urolithin A market, including the reputation and credibility of urolithin A itself as an anti-aging supplement ingredient.  For example, as noted above, Defendants' fake urolithin A products are identified on Amazon.com as "related" or alternatives to Plaintiffs' own urolithin A supplement products, but may have none of the beneficial effect consumers would expect from urolithin A, or even have adverse effects as discussed above.  Such results from fake products may affect consumer impression of the genuine ingredient and therefore decrease demand even for legitimate urolithin A supplements.

82.    Defendants' misrepresentations regarding their fake "urolithin A" supplements also harm Plaintiffs by frustrating Plaintiffs' efforts to protect their extensive investments in researching, developing and commercializing urolithin nutritional supplements and building the market for urolithin A supplements.  For example, Plaintiffs have invested in securing dozens of patents throughout the world related to urolithin compounds, including patents directed to the synthesis of urolithin compounds, compositions containing urolithin compounds, and to supplementing one's diet with effective amounts of urolithin compounds for beneficial effects on the body and health outcomes.

83.    By falsely labeling their products as containing urolithin A, including in equivalent or greater doses to products offered by Plaintiffs, and by marketing

their fake urolithin A products as offering the benefits established by Plaintiffs through rigorous clinical trials, for many of which Amazentis has received patent protection, Defendants have caused and continue to cause harm to Plaintiffs, including irreparable harm to Plaintiffs' business and reputation, and have caused and continue to cause Plaintiffs to lose sales of their urolithin A products.

## DEFENDANTS' INFRINGEMENT OF PLAINTIFFS' TRADEMARKS

84.     Defendants have also harmed and continue to harm Plaintiffs' by deceptively and without authorization having used and continuing to use Plaintiffs' MITOPURE® trademark to market and sell their fake urolithin A products.

85.     Plaintiff Amazentis SA has registered its MITOPURE® trademark, in various forms, with the United States Patent and Trademark Office (attached as **Exhibits 1-1, 1-2, 1-3**) in connection with dietary supplements and ingredients for dietary supplements among other things.  Amazentis' MITOPURE® trademark has been used exclusively and continuously by Plaintiffs for many years and has never been abandoned.

86.     The MITOPURE® trademark is proprietary to Plaintiffs and is displayed extensively on Plaintiffs' urolithin A products and in Plaintiffs' marketing and promotional materials for those products.  Plaintiffs' MITOPURE® trademark has been the subject of substantial and continuous marketing and promotion by Plaintiffs at significant expense.  Plaintiffs' promotional efforts

include—by way of example, but not limitation—media, a website, social media sites, and point of sale materials.

87. Plaintiffs' MITOPURE® trademark is fanciful and highly distinctive when applied to Plaintiffs' products and has become an even stronger indicator of source due to Plaintiffs' longstanding use of it to brand its high-quality products. As a result of the inherent strength of the mark and the significant reputation Plaintiffs have established in it, Plaintiffs' MITOPURE® trademark has become a highly valuable indicator of source. It signifies to consumers that the products bearing it come from Plaintiffs and are manufactured to Plaintiffs' quality standards. By falsely and deceptively using Plaintiffs' MITOPURE® trademark, without authorization, to sell their fake urolithin A products, Defendants are causing a likelihood of confusion or misunderstanding among the public as to the source and quality of Defendants' fake urolithin A products. Defendants' deceptive and unauthorized use of Plaintiffs' MITOPURE® trademark is also causing a likelihood of confusion and/or misunderstanding as to the affiliation, connection, or association of Defendants and their fake urolithin A products with Plaintiffs and their genuine urolithin A products. In so doing, Defendants attempt to divert sales from Plaintiffs' genuine product to their own falsely advertised and fake product.

88.    Defendants' actions in falsely branding their fake urolithin A products as though they emanate from Plaintiffs and their brand is further likely to harm Plaintiffs by negatively impacting the reputation, trust, and goodwill of the MITOPURE® trademark, when consumers who receive substandard, ineffective, or even harmful products mistakenly believe those were manufactured by or otherwise associated with Plaintiffs or their MITOPURE® brand.

## CLAIMS FOR RELIEF

### COUNT I
### (Unfair Competition & False Advertising in Violation of the Lanham Act)
### (15 U.S.C. § 1125)

89.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

90.    Plaintiffs have invested significant time, money, and other resources in developing the market for urolithin A products, marketing their own urolithin A product, and in creating goodwill and trust within community of consumers interested in the benefits urolithin A provides.

91.    At all relevant times, Plaintiffs have been engaged in the business of marketing and selling their urolithin A product in interstate commerce via the Internet, including on their website and on Amazon.com.

92.    At all relevant times, Defendants' have been engaged in the business of marketing and selling falsely labeled "urolithin A" supplement product in

interstate commerce, across state and/or country lines, via the Internet, including

on their websites and on Amazon.com.

93.    Defendants have made and continue to make false and misleading

statements in commercial advertising, including in their "urolithin A" product

labels, advertising, and promotional materials to customers, potential customers,

and other members of the pubic.

94.    Defendants' false and misleading statements have and will continue to

affect goods that have travelled and will travel in interstate commerce, including

Defendants' falsely labeled urolithin A supplement products and Plaintiffs' own

urolithin A supplement products.

95.    Defendants' false and misleading statements have or will have the

effect of misleading customers, potential customers and other members of the

public, including but not limited to, in the false beliefs that Defendants' purported

"urolithin A" supplement products contain the amounts of urolithin A reflected on

their product labels, or any urolithin A, and are alternatives for Plaintiffs' urolithin

A supplement products.

96.    Defendants' false and misleading statements have or will have the

effect of misleading customers, potential customers and other members of the

public in other ways, including but not limited to, in the false beliefs that

Defendants' purported "urolithin A" supplement products are made in the United

States, are manufactured and sold by United States companies, are subject to third-party testing and other quality assurance measures, are "vegan" or "veggie," and have benefits attributable to supplements that actually feature urolithin A.

97.     Defendants' statements are literally false and/or misleading commercial speech in violation of Section 43 of the Lanham Act, 15, U.S.C. § 1125.

98.     Defendants' false and misleading statements are material and likely to influence the decisions of customers, potential customers, and other members of the public, including, but not limited to, in their decisions to purchase urolithin A supplement products, such as the choice to purchase Defendants' purported "urolithin A" supplement products rather than Plaintiffs' MITOPURE® urolithin A supplement products.

99.     At all relevant times, Defendants knew their product labels, advertising and product claims were false, including that their products did not contain the advertised amount of urolithin A, and/or any detectable urolithin A for that matter.

100.    Accordingly, Defendants' have violated and continue to violate Section 43 of the Lanham Act, 15, U.S.C. § 1125 *et seq*.

101.    Defendants have made these false and misleading statements knowingly, willfully, and/or negligently.

102.    Plaintiffs have suffered, and will in the future suffer, harm as a result of Defendants' false and misleading statements, including diminished reputation, loss of goodwill, lost sales, loss of future revenue, loss of investments, loss of customers, and/or confusion about comparative attributes of Defendants' fake urolithin A products and Plaintiffs' own urolithin A supplement products.

103.    The injuries and damage sustained by Plaintiffs have been directly and proximately caused by Defendants' false and misleading statements.

104.    Defendants' conduct violates Section 43 of the Lanham Act in a manner that harms Plaintiffs. Plaintiffs are therefore entitled to all relief available under the Lanham Act Section 43 and 15 U.S.C. § 1117, including but not limited to disgorgement of Defendants' profits, actual damages, and attorneys' fees and costs.

105.    Plaintiffs have no adequate remedy at law, and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their business, reputation and the goodwill for Plaintiffs' urolithin A products.

## <u>COUNT II</u>
### (Trademark Infringement Under 15 U.S.C. § 1114)

106.    Plaintiffs' reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

107.    Plaintiff Amazentis SA is the registered owner of the MITOPURE®

trademark (*see* Exhibits 1-1, 1-2, 1-3).  The United States registrations for

Plaintiffs' MITOPURE® trademark are in full force and effect.

108.    Defendants have engaged in the unauthorized use in commerce of

Plaintiffs' registered trademark MITOPURE® in connection with the sale, offering

for sale, distribution, and/or advertising of infringing goods.

109.    Defendants have sold, offered to sell, marketed, distributed, and

advertised purported urolithin A consumer products branded with Plaintiffs'

registered MITOPURE® trademark without Plaintiffs' permission.

110.    Upon information and belief, Defendants have knowledge of

Plaintiffs' rights in the MITOPURE® trademark and are willfully infringing and

intentionally using Plaintiffs' MITOPURE® trademark to brand, advertise, and sell

fake urolithin A supplement products.

111.    Defendants willful, intentional, and unauthorized use of Plaintiffs'

MITOPURE® trademark to sell their fake urolithin A supplement products is

likely to cause, will cause, and is currently causing confusion, mistake, and

deception as to the origin and quality of the falsely labeled products and the quality

of Plaintiffs' own urolithin A consumer products sold under the MITOPURE®

trademark.

112.    Accordingly, Defendants' have violated and continue to violate Section 32 of the Lanham Act, 15, U.S.C. § 1114 *et seq.*

113.    Defendants' activities constitute willful trademark infringement and/or counterfeiting under 15 U.S.C. § 1117.

114.    Plaintiffs have suffered, and will in the future suffer, harm as a result of Defendants' unauthorized use of Plaintiffs' MITOPURE® trademark, including diminished reputation, loss of goodwill, lost sales, loss of future revenue, loss of investments, loss of customers, and/or confusion about comparative attributes of Defendants' fake urolithin A products and Plaintiffs' own urolithin A supplement products.

115.    The injuries and damage sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of falsely labeled urolithin A products using MITOPURE® and/or counterfeit MITOPURE® products.

116.    Defendants' conduct violates Section 32 of the Lanham Act in a manner that harms Plaintiffs. Plaintiffs are therefore entitled to all relief available under the Lanham Act Section 32 and 15 U.S.C. § 1117, including but not limited to disgorgement of Defendants' profits, actual damages, and attorneys' fees and costs.

117.    Plaintiffs have no adequate remedy at law, and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputation and the goodwill of their MITOPURE® trademark.

## COUNT III
### (False Designation of Origin 15 U.S.C. § 1125)

118.    Plaintiffs' reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

119.    Defendants' promotion, marketing, offering for sale, and sale of supplement products labeled with Plaintiffs' MITOPURE® trademark in interstate commerce, despite their lack of any connection to Plaintiffs or their brand, have created and are creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiffs or the origin, sponsorship, or approval of Defendants' fake urolithin A products by Plaintiffs.

120.    By using Plaintiffs' MITOPURE® trademark in connection with the sale of fake urolithin A products, Defendants falsely designate the origin of their fake urolithin A products.

121.    Accordingly, Defendants' have violated and continue to violate Section 43 of the Lanham Act, 15, U.S.C. § 1125 *et seq.*

122.    Defendants' conduct constitutes willful false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of their falsely labeled and/or counterfeit products to the general public under 15 U.S.C. §§ 1125.

123.    Plaintiffs have suffered, and will in the future suffer, harm as a result of Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of their falsely labeled and/or counterfeit products to the general public, including diminished reputation, loss of goodwill, lost sales, loss of future revenue, loss of investments, loss of customers, and/or confusion about comparative attributes of Defendants' fake urolithin A products and Plaintiffs' own urolithin A supplement products.

124.    The injuries and damage sustained by Plaintiffs have been directly and proximately caused by Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of their falsely labeled and/or counterfeit products to the general public.

125.    Defendants' conduct violates Section 43 of the Lanham Act in a manner that harms Plaintiffs. Plaintiffs are therefore entitled to all relief available under the Lanham Act Section 43 and 15 U.S.C. § 1117, including but not limited to disgorgement of Defendants' profits, actual damages, and attorneys' fees and costs.

126.    Plaintiffs have no adequate remedy at law, and, if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of its brand.

**COUNT IV**
**(Deceptive Trade Practices Under**
**Massachusetts General Laws §§ 93(a) *et seq.*)**

127.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

128.    Defendants have made false and misleading statements, including those described in this Complaint, which constitute deceptive trade practices in violation of Massachusetts' Unfair Competition Law, Mass. General Laws §§ 93(a) *et seq*.

129.    Defendants' falsely and misleadingly misrepresent the amount and/or presence of urolithin A in Defendants' urolithin A products.

130.    Defendants have also falsely and misleadingly represented that their fake urolithin A products are made in the USA, sold by companies located in the USA, subject to third-party testing and other quality assurance measures, vegan or vegetarian, and capable of providing the benefits associated with supplementing one's diet with urolithin A.

131.    Defendants have also deceptively and without authorization used Plaintiffs' MITOPURE® trademark to market and sell their fake urolithin A

products which creates a likelihood of confusion or misunderstanding among the public.

132.    Defendants' false and misleading statements are likely to deceive and, unless they are stopped, will continue to deceive customers, potential customers, and the public about the quantity of urolithin A and indeed presence of urolithin A contained in Defendants' urolithin A supplement products.

133.    Defendants deceptive conduct is also likely to cause confusion and/or misunderstanding as to the source of their goods, and as to the affiliation, connection, or association of those goods with Plaintiffs and their genuine MITOPURE® products.

134.    Defendants have targeted sales to Massachusetts residents by setting up and operating the e-commerce stores identified on Schedule A that target United States consumers using one or more of the brands identified in Schedule A, offering shipping to the United States, including Massachusetts, and accepting payment in U.S. dollars and/or funds from U.S. bank accounts.  On information and belief, Defendants have sold dietary supplement products falsely claiming to have urolithin A as an active ingredient, including while using Plaintiffs' MITOPURE® trademark, to residents of Massachusetts.

135.    Each of the Defendants is committing tortious acts in Massachusetts, engaging in interstate commerce directed *inter alia* to purchasers in this District, and wrongfully causing Plaintiffs substantial injury in the State of Massachusetts.

136.    Accordingly, Defendants' have violated and continue to violate Massachusetts' Unfair Competition Law, Mass. General Laws §§ 93(a) *et seq*.

137.    Plaintiffs have suffered, and will suffer, harm as a result of Defendants' false and misleading statements.

138.    Defendants made their false and misleading statements knowingly, recklessly, or negligently.

139.    Plaintiffs have suffered, and will in the future suffer, harm as a result of Defendants' false and misleading statements, including diminished reputation, loss of goodwill, lost sales, loss of future revenue, loss of investments, loss of customers, and/or confusion about comparative attributes of Defendants' fake urolithin A products and Plaintiffs' own urolithin A supplement products.

140.    The injuries and damage sustained by Plaintiffs have been directly and proximately caused by Defendants' false and misleading statements.

141.    Defendants' conduct violates Section 93(a) of the Mass. General Laws in a manner that harms Plaintiffs. Plaintiffs are therefore entitled to all relief available under Section 93(a) of the Mass. General Laws, including but not limited

to disgorgement of Defendants' profits, actual damages, and attorneys' fees and costs.

142.    Plaintiffs have no adequate remedy at law, and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their business, reputation and the goodwill for Plaintiffs' urolithin A products.

## COUNT V
### (Common Law Trademark Infringement and Unfair Competition)

143.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

144.    Plaintiffs, which do business in Massachusetts, have longstanding common law rights in the MITOPURE® trademark for urolithin A containing consumer products, including supplement products.

145.    The MITOPURE® trademark is a strong, inherently distinctive trademark that has acquired further distinctiveness due to its recognition and reputation among consumers, and its unique nature in the marketplace.

146.    Plaintiffs' use of and rights in the MITOPURE® trademark in Massachusetts long predate any use by Defendants of "Mitopure."

147.    Plaintiffs sell urolithin A containing consumer products, including supplement products, through Amazon.com and other online e-commerce platforms.

148.    Defendants sell what they claim are urolithin A containing supplement products through Amazon.com and other online e-commerce platforms.

149.    On information and belief, Defendants knew of the MITOPURE® trademark when they started to use "Mitopure" to advertise and sell their own supplement products purported to contain urolithin A.

150.    Defendants' use of "Mitopure" is unfair and deceptive, in that it is likely to cause confusion, mistake, or deception as to the source, sponsorship, affiliation, or approval of Defendants' purported urolithin A supplement products, to Plaintiffs' damage and detriment.

151.    Defendants have targeted sales to Massachusetts residents by setting up and operating the e-commerce stores identified on Schedule A that target United States consumers using one or more of the brands identified in Schedule A, offering shipping to the United States, including Massachusetts, and accepting payment in U.S. dollars and/or funds from U.S. bank accounts.  On information and belief, Defendants have sold dietary supplement products falsely claiming to have urolithin A as an active ingredient, including while using Plaintiffs' MITOPURE® trademark, to residents of Massachusetts.

152.    Each of the Defendants is committing tortious acts in Massachusetts, engaging in interstate commerce directed *inter alia* to purchasers in this District, and wrongfully causing Plaintiffs substantial injury in the State of Massachusetts.

153.    Accordingly, Defendants' unauthorized use of Plaintiffs' MITOPURE® trademark, false and misleading statements, and other acts of unfair competition described herein constitutes common law trademark infringement and unfair competition at common law.

154.    Defendants' activities constitute willful trademark infringement and unfair competition under common law.

155.    Plaintiffs have suffered, and will in the future suffer, harm as a result of Defendants trademark infringement and unfair competition, including diminished reputation, loss of goodwill, lost sales, loss of future revenue, loss of investments, loss of customers, and/or confusion about comparative attributes of Defendants' fake urolithin A products and Plaintiffs' own urolithin A supplement products.

156.    The injuries and damage sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, sale of falsely labeled urolithin A products using "Mitopure" and/or counterfeit MITOPURE® products, false and misleading statements, and other acts of unfair competition described herein.

157.    Defendants' conduct violates the common law of the State of Massachusetts in a manner that harms Plaintiffs. Plaintiffs are therefore entitled to all relief available under Massachusetts law, including but not limited to disgorgement of Defendants' profits, actual damages, and attorneys' fees and costs.

158.    Plaintiffs have no adequate remedy at law, and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their business, reputation and the goodwill of their urolithin A products and MITOPURE® trademark.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A.    A judgment that Defendants have violated 15 U.S.C. § 1125, including in connection with their false and misleading labeling, advertising, and promotion of urolithin A supplement products;

B.    A judgment that Defendants have violated 15 U.S.C. § 1114, including in connection with their unauthorized and misleading use of Plaintiffs' registered trademark in connection with the sale, offering for sale, distribution, and advertising of Defendants' supplement products;

C.    A judgement that Defendants have violated 15 U.S.C. § 1125, including in connection with their false and misleading designation of origin of urolithin A supplement products;

D.    A judgment that Defendants have violated the Massachusetts' Unfair Competition Law, Mass. General Laws §§ 93(a) *et seq.*, including in connection with their false and misleading promotion of their urolithin A supplement products, their use of Plaintiffs' trademark, and/or engaging in any other deceptive trade practices;

E.    A judgment that Defendants have violated infringed Plaintiffs trademarks and/or engaged in unfair competition at common law, including in connection with their false and misleading promotion of their urolithin A supplement products, their use of Plaintiffs' trademark and/or engaging in any other deceptive trade practices and/or acts of unfair competition;

F.    Injunctive relief enjoining Defendants, together with their directors, officers, agents, servants, employees, attorneys, parents, subsidiaries, divisions, affiliates, other related business entities, and all persons in active concert or privity with them and their successors and assigns, temporarily, preliminarily, and permanently from:

       1.    Making, using, offering for sale, selling, and/or importing into or in the United States any fake and/or falsely labeled urolithin A products, any products that contain an amount of urolithin A other than what is promoted, any products that falsely purport to be made in the USA that are not made in the USA, any

products that falsely purport to be subject to third-party testing and other quality assurance measures, that falsely purport to be "veggie" or "vegan" that are not "veggie" or "vegan," or that identify false or misleading business names or addresses on the product packaging or advertisements;

2.    Aiding, abetting, contributing to, or otherwise assisting anyone in making, using, offering for sale, selling, and/or importing into or in the United States fake and/or falsely labeled urolithin A products, any products that contain an amount of urolithin A other than what is promoted, any products that falsely purport to be made in the USA that are not made in the USA, any products that falsely purport to be subject to third-party testing and other quality assurance measures,  that falsely purport to be "veggie" or "vegan" that are not "veggie" or "vegan," or that identify false or misleading business names or addresses on the product packaging or advertisements;

3.    Using Plaintiffs' trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising,

offering for sale, or sale or any product that is not a genuine

product branded by or under license from Plaintiffs;

4.  Passing off, inducing, or enabling others to sell or pass off any

product as a genuine product or any other product produced by

Plaintiffs that is not Plaintiffs' or not produced under the

authorization, control, or supervision of Plaintiffs and approved

by Plaintiffs for sale under the trademarks;

5.  Committing any acts that would cause consumers to believe

that Defendants' products are sold under the authorization,

control, or supervision of Plaintiffs, or are sponsored by,

approved by, sourced from, or otherwise connected with

Plaintiffs;

6.  Further infringing Plaintiffs' trademarks and damaging

Plaintiffs' reputation and goodwill;

7.  Otherwise competing unfairly with Plaintiffs and/or engaging in

deceptive trade practices in any manner; and

8.  Effecting assignments or transfers, forming new entities or

associations, creating new accounts on e-commerce platforms,

or utilizing any other device for the purpose of circumventing

or otherwise avoiding the prohibitions set forth in

subparagraphs (1) to (7).

G.    Entry of an Order that, upon Plaintiffs' request, any third party with

actual notice of the Order who is providing services for Defendants, or in

connections with Defendants' online marketplaces, including without limitation,

any online marketplace platforms such as such as, but not limited to, eBay,

AliExpress, Alibaba, Amazon, and IBSPOT (collectively the "Third Party

Providers") shall:

    1.    Disable and cease providing services to any accounts through

        which Defendants engage or have engaged in the sale of fake,

        falsely labeled, and/or falsely advertised urolithin A products;

    2.    Disable and cease displaying any advertisements used by or

        associated with Defendants in connection with the sale of the

        fake, falsely labeled, and/or falsely advertised urolithin A

        products;

    3.    Disable and cease providing services to any accounts through

        which Defendants engage or have engaged in the sale of

        supplements or related products using Plaintiffs' trademarks;

4.      Disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of products using Plaintiffs' trademarks;

5.      Disable and cease providing services to any accounts through which Defendants have engaged acts of unfair competition and/or deceptive trade practices;

6.      Disable and cease displaying any advertisements used by or associated with Defendants that have engaged acts of unfair competition and/or deceptive trade practices;

7.      Take all steps necessary to prevent links to the online marketplace accounts identified in Schedule 1 from displaying in search results, including, but not limited to, removing links to the URLs from any search index;

H.      Entry of an order requiring Defendants to take all necessary corrective measures to correct any false and misleading impressions created among customers, potential customers, and the public by Defendants' false and misleading statements, unauthorized use of Plaintiffs' trademarks, and/or acts of unfair competition and/or deceptive trade practices.

I.      An accounting be ordered to determine Defendants' profits resulting from their false and misleading advertising and/or labeling, false designation of

origin, and/or trademark infringement, in violation of 15 U.S.C. § 1125; 15 U.S.C.

§ 1114; and Massachusetts' Unfair Competition Law, Mass. General Laws §§

93(a) *et seq.*

    J.    Entry of an Order that Plaintiffs be awarded monetary relief in an

amount to be fixed by the Court in its discretion as it finds just as an equitable

remedy and as a remedy, including:

    1.    All profits received by Defendants from sales and revenues of

any kind made as a result of its mislabeling of fake urolithin A

products, other acts of false advertising described above (e.g.

falsely advertising products as "MADE IN USA," subject to

third-party testing and other quality assurance measures,

"veggie," "vegan," and by using  false or misleading business

names or addresses on the product packaging or

advertisements), from Defendants' unauthorized use of

Plaintiffs' trademarks, and/or false designation of origin of their

products, and from Defendants' acts of unfair competition

and/or deceptive business practices against Plaintiffs, said

amount to be trebled;

    2.    All damages sustained by Plaintiffs as a result of Defendants'

acts of false and misleading advertising, promotion, designation

of origin, labeling of urolithin A supplement products,
Defendants' unauthorized use of Plaintiffs' trademarks, and/or
from Defendants' acts of unfair competition and/or deceptive
business practices against Plaintiffs, including but not limited
to, damages for Plaintiffs' lost business and profit, and harm to
Plaintiffs' goodwill and reputation, said amount to be trebled;

3.    In the alternative, awarding Plaintiff statutory damages
pursuant to 15 U.S.C. § 1117(c) of not less than $1,000 and not
more than $2,000,000 per counterfeit mark per type of goods or
services sold, offered for sale, or distributed.

K.    Entry of an Order adjudicating that this case is exceptional;

L.    An award of treble, punitive and/or exemplary damages for
Defendants' violation of 15 U.S.C. § 1114 and/or 15 U.S.C. § 1125;

M.    An award of attorneys' fees Plaintiffs incurred for Defendants'
violations of 15 U.S.C. § 1114 and/or 15 U.S.C. § 1125;

N.    A judgment that awards Plaintiffs damages adequate to compensate
them for Defendants' violations of Massachusetts' Unfair Competition Law, Mass.
General Laws §§ 93(a) *et seq.* and other applicable law;

O.      An award of enhanced and punitive damages for Defendants'
violations of Massachusetts' Unfair Competition Law, Mass. General Laws
§§ 93(a) *et seq*. and other applicable law;

P.      An award of attorneys' fees Plaintiffs incurred due to Defendants'
violations of Massachusetts' Unfair Competition Law, Mass. General Laws
§§ 93(a) *et seq*. and other applicable law;

Q.      Awarding Plaintiffs its costs and expenses in this action, including
expert and witness fees;

R.      An award of prejudgment and post-judgment interest; and

S.      Awarding Plaintiffs such other and future relief as this Court deems
just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully demand a trial by jury on all issues triable by jury.

Dated: October 6, 2025

By: *Nathanial J. McPherson*

Nathanial J. McPherson
  Mass Bar No. 697666
**FOLEY HOAG LLP**
Seaport West
155 Seaport Boulevard
Boston, MA 02210-2600
Phone: 617.832.1000
Fax: 617.832.7000
nmcpherson@foleyhoag.com

*Of Counsel*

Dana M. Gordon
Mass Bar No. 652757
**FOLEY HOAG LLP**
Seaport West,
155 Seaport Boulevard
Boston, MA 02210-2600
Phone: 617.832.1000
Fax: 617.832.7000
dgordon@foleyhoag.com

Jeffrey I. D. Lewis
  pro hac vice application forthcoming
**FOLEY HOAG LLP**
1301 Avenue of the Americas, 25th Floor
New York, NY 10019
Phone: 212.812.0400
Fax: 212.812.0399
jidlewis@foleyhoag.com

*Attorneys for Plaintiff AMAZENTIS SA and TIMELINE LONGEVITY, INC.*